# UNITED STATES DISTRICT COURT
## FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Applicant, | ) ) | CIVIL ACTION NO. |
| v. | ) ) ) ) ) | MEMORANDUM IN SUPPORT OF APPLICATION FOR ORDER TO SHOW CAUSE WHY A SUBPOENA SHOULD NOT BE |
| KRONOS INCORPORATED, | ) ) | ENFORCED |
| Respondent. | ) | |

## I. INTRODUCTION

This case comes before the Court on the application of the United States Equal

Employment Opportunity Commission, ("the Commission") for an Order to Show Cause why

the Commission's Subpoena Should Not be Enforced.  This matter arises out of the

Commission's investigation of potential race and disability discrimination in connection with

Respondent's use of a personality assessment instrument.

On July 3, 2007, Charging Party Vicky Sandy filed a charge of disability discrimination

against Kroger Food Stores ("Kroger"), under the Americans with Disabilities Act ("ADA").

The charge, titled *Sandy v. Kroger Food Stores*, Charge No. 533-2007-01236, alleges that Ms.

Sandy was subjected to discrimination on the basis of disability when Kroger failed to hire her

for the position of cashier/bagger because of her hearing impairment.

The Commission has expanded its investigation both geographically and statutorily.

Specifically, based on additional failure to hire charges of discrimination filed against Kroger,

the Commission has expanded its investigation to include a nationwide scope, and also to include Title VII (failure to hire/black).

In determining which applicants to hire, Kroger administers a personality assessment instrument or test which is manufactured by Respondent, Kronos Incorporated ("Kronos"). The test results for Ms. Sandy indicated that she would not be a good choice for the position of cashier/bagger, as she failed the "communications" section of the assessment.

During the course of its investigation, the EEOC issued a third-party subpoena to Kronos, seeking documents and other information relating to its investigation of Ms. Sandy's charge, as well as the expanded scope, which now includes Title VII (race). Respondent Kronos to date has failed to produce the requested information, and that failure has delayed and hampered the investigation of Ms. Sandy's charge, as well as the other failure to hire charges against Kroger, which are simultaneously under investigation by the Commission. The EEOC therefore requests that the Court issue an Order To Show Cause Why the Subpoena Should Not be Enforced.

## II. STATEMENT OF FACTS

On July 3, 2007, Vicky Sandy filed a charge of employment discrimination with the EEOC, alleging that she was subjected to discrimination because of her disability. (EEOC Charge of Discrimination No. 533-2007-01236, attached as Exhibit 1). Ms. Sandy specifically alleged that Kroger subjected her to discrimination in violation of the Americans with Disabilities Act ("ADA") when it failed to hire her for the position(s) of Bagger, Cashier, and/or Stocker because, as it advised her at the time of her interview, she was not a "good fit" for any open position due to the manner in which she speaks.[1]  Furthermore, after refusing to hire her, Kroger continued seeking applicants for these jobs. (See Exhibit 1.)

---

[1] Ms. Sandy is clinically deaf and suffers from a speech impairment.

## **Selection Process – Testing**

In May 2007, Ms. Sandy applied for the open positions of cashier, bagger/carrier, and deli clerk at Kroger's Store 733, located at 198 Emily Drive, Clarksburg, WV.  Ms. Sandy was aware of the open positions because Kroger had posted "Help Wanted" signs inside the store. Ms. Sandy completed an online application at a computer kiosk inside Store 733.[2]

Ms. Sandy was required, as part of the job application process, to complete a "Customer Service Assessment," which is distributed and scored by Kronos, an outside vendor and the Respondent in this matter.  The Customer Service Assessment developed by Kronos and utilized by Kroger purports to "measure the human traits that underlie strong service orientation and interpersonal skills, such as: Controlling impatience; Showing respect; Listening attentively; Working well on a team; and Being sensitive to others' feelings."  (See Kronos Customer Service Assessment, attached as Exhibit 2.)  Kronos claims that its Customer Service Assessments "helps employers hire people who have strong service-oriented attributes."  It asserts that "[a]pplicants who score well are more likely to: Act cheerful, polite, and friendly; Approach customers and take the lead to help; Listen carefully, understand and remember; Communicate well with customers;...Stay energetic with a lot of customer contact; and Make a good impression."  (See Exhibit 2.)

Kronos' Customer Service Assessment consists of fifty (50) statements, to which the applicant must answer "Strongly Disagree, Disagree, Agree, or Strongly Agree."  The test includes statements such as the following:

-        You always have confidence in yourself

-        You are always cheerful

---

[2] Job applicants can also access the application process using Kroger's website, www.kroger.com.

3

- It is easy for you to feel what others are feeling

- You are unsure of what to say when you meet someone

- You talk a lot

- You are a friendly person

- You are unsure of yourself with new people

- You chat with people you don't know

- You like to be in the middle of a big crowd

A few days after completing the online application at Store 773, Kroger Store Manager Bob Bowers called Ms. Sandy in for an interview. Mr. Bowers testified that completed applications are stored by way of an online database which he believes is maintained by Kronos, and that once a new application is available for viewing, he is able to access it via the database.[3] During Ms. Sandy's interview, Mr. Bowers reviewed her Customer Service Assessment results and informed Ms. Sandy that he was concerned with her score on the "Communication" portion of the assessment. He also told her that he had trouble understanding her, and that customers might not be able to understand her. Mr. Bowers further testified that he also told Ms. Sandy that he was concerned about her lack of job experience.

Ms. Sandy's "Employment Application Summary," which was provided to the Commission by Kroger, clearly reads "Powered by Kronos" in the upper right hand corner of each page. It reflects that although she scored well (84%) on the "Dependability" portion of the Customer Service Assessment, she scored much lower (40%) in the "Communication" portion of

---

[3] Mr. Bowers further testified that he does not have access to the online applications before the Customer Service Applications have been scored, and that he does not know whether Kronos pre-screens some of the applications.

the assessment.  (Vicky Sandy's Employment Application Summary at pg. 4, attached as Exhibit 3.)

According to the Employment Application Summary, Ms. Sandy's lower score on the Communication portion of the assessment indicates that she "is less likely to: Maintain a good mood; Show patience instead of frustration; Spend time with customers, not alone; Consider customers' feelings and needs; **Listen carefully, understand and remember;** and Cooperate with co-workers" (emphasis added).  (See Exhibit 3.)  Based solely on her application and Customer Service Assessment responses, there would be no way for a test scorer to know that Ms. Sandy is clinically deaf.  Moreover, there does not appear to be a mechanism built into the Customer Service Assessment to determine whether an applicant has responded in a certain manner because he or she is disabled.  In other words, a job applicant may respond "Strongly Disagree" to the statement "You like to talk a lot" not because he or she is unfriendly, unsociable, or non-customer-oriented, but because he or she suffers from a speech/hearing impairment, such as Ms. Sandy, or from another disability where communication ability is significantly impaired.

The final page of Ms. Sandy's Employment Application Summary contains several "Assessment Follow-On Questions" for management to ask of the applicant.  Mr. Bowers testified that he asked Ms. Sandy the Assessment Follow-On Questions indicated in her Employment Application Summary, because doing so was a guideline he was required to follow.  The Assessment Follow-on Questions appear to be geared toward the applicant's weaknesses, as indicated by the questions Mr. Bowers was prompted to ask Ms. Sandy.  The Assessment Follow-On Questions on Ms. Sandy's Employment Application Summary include, in part, the following:

Describe the hardest time you've had understanding what someone was talking about.

Listen for: Listens well, asks clear questions, shows understanding by summarizing/reflecting back what speaker says.

(How well does the applicant speak during the interview.)

Listen for: Correct language, clear enunciation, appropriate volume/tone/expression/smile eye contact

At the conclusion of the interview, Mr. Bowers informed Ms. Sandy that she would not be a good fit for any of the open positions because of her speech impairment.[4]

## **Charge Procedures**

Charging Party Vicky Sandy filed a charge of discrimination with the Pittsburgh Area Office of the EEOC on July 3, 2007. (See Exhibit 1 and Affidavit of Marie M. Tomasso, attached as Exhibit 19.) Kroger was served with the charge on July 12, 2007. (Notice of Charge of Discrimination, attached as Exhibit 4 and Exhibit 19.) On August 17, 2007, Kroger provided a Position Statement in response to Ms. Sandy's charge by way of its Labor Relations Manager, David L. Lyons. (Kroger's Position Statement, attached as Exhibit 5 and Exhibit 19.) On January 16, 2008, the EEOC requested additional information from Kroger regarding the Customer Service/Dependability Assessments utilized in its hiring process, as well as the names and job applications for all individuals who applied and/or were hired as cashiers/baggers from January 1, 2007 until the present. The EEOC also requested complete copies of the assessments, job descriptions, a list of all possible "add-on questions," and any validation studies Kroger might have regarding the assessment(s). (Request for Information, attached as Exhibit 6 and Exhibit 19.)

---

[4] Further, Kroger admitted in its Position Statement to the Commission that Ms. Sandy was not hired, at least in part, due to her score on the Customer Service Assessment.

Kroger only partially complied with the EEOC's requests, providing the Commission with the names and applications of all individuals who applied for and/or were hired for the positions of cashier/bagger between May 2007 and December 2007. (See Exhibit 19.) It provided a copy of the Kronos Customer Service Assessment, as well as a list of add-on questions and job descriptions. Kroger provided Employment Application Summaries for each applicant for the Cashier and Bagger positions between May and December 2007, and analysis of that material makes clear that several individuals were hired after Charging Party applied in May 2007. Importantly, Kroger has refused to provide the Commission with any information regarding validation studies for the Customer Service Assessment, or any other assessment, objecting on the bases of burdensomeness and relevance. (Letter from David Lyon to Investigator Alan Archer dated February 14, 2008, attached as Exhibit 7.)[5]

The Commission issued a subpoena to Kronos on March 11, 2008 – Subpoena No. TPI-832, which is attached as Exhibit 8. (See Exhibit 19.) That subpoena was later rescinded. (See Exhibit 19.) As explained in further detail below, based on information from Ms. Sandy's Charge as well as several other failure to hire charges against Kroger, the Commission decided to expand the scope of its investigation, and determined that all parties' interests would be best served by rescinding Subpoena No. TPI-832. Instead, the Commission seeks both the original and expanded information via Subpoena No. TPI-864, which is the subject of this Memorandum and is attached as Exhibit 9. (See Exhibit 19.)

By way of further background and to shed light on the reasons for the Commission's decision to expand the scope of this investigation, the Commission points out that although Ms.

---

[5] It is unknown whether Kroger even has access to Kronos' validity studies, and, if so, whether it may distribute same without violating a contractual relationship with Kronos.

7

Sandy's experience with Kronos' Customer Service Assessment was limited to her application for positions at Kroger Store 773, Kroger utilizes Kronos' Customer Service Assessment for **every retail position in all of its stores**.

As a result of Kroger's use of the Kronos Customer Service Assessment and because the potential implications for any person taking the test (as exemplified by Ms. Sandy's experience), on or about March 13, 2008, the Commission expanded this investigation to encompass a nationwide scope.  Kroger was notified in writing of the scope expansion.  (March 13, 2008 Expansion Letter attached as Exhibit 10; See Exhibit 19.)  Significantly, a review of the Commission's available records indicated that not only have individuals complained that Kroger has refused to hire them on the basis of disability, but also on the basis of race.  Accordingly, after expanding the scope of the investigation to a nationwide scope focused on disability, on May 30, 2008, the Commission further expanded the scope of its nationwide investigation to include Kroger's use of assessment tests in its hiring process and Title VII failure to hire claims based on race (black).  (May 30, 2008 Expansion Letter attached as Exhibit 11; See Exhibit 19.)

On October 7, 2008, the EEOC issued the instant subpoena to Kronos' Talent Management Division, requesting the following information: documents and data constituting or related to validation studies or validation evidence pertaining to the assessment tests purchased by Kroger; the user's manual and instructions for use of the assessment tests used by Kroger; documents and data relating to Kroger and its use of the assessment tests as well as results, ratings, or scores of individual test-takers, and any validation efforts made thereto; documents discussing, analyzing, or measuring potential adverse impact on individuals with disabilities and/or race; documents related to any and all job analyses created or drafted by any person or entity relating to any and all positions with Kroger; and a catalogue including each and every

assessment offered by Kronos, including descriptions of same. Although Subpoena No. TPI - 832, which did not include a request for information pertaining to race was issued in March 2008 and later rescinded[6], no pre-subpoena inquiries or requests were made, as the subpoena was directed to a third-party (Kronos), and not the employer directly involved in Ms. Sandy's charge (Kroger). (See Exhibits 9 and 19.)

The information requested in Subpoena TPI - 864 is both relevant and necessary to the Commission's investigation of the instant Charge. Kronos, to date, has not provided any information to the Commission. On October 7, 2008, the Commission received a Petition to Revoke Subpoena from Kronos, which is attached as Exhibit 12. (See Exhibit 19.) Much of Kronos' Petition to Revoke the instant subpoena is based upon its Petition to Revoke Subpoena No. TPI - 832, which the Commission received March 28, 2008. (Petition to Revoke Subpoena No. TPI -832 attached as Exhibit 13.)

On January 7, 2009, the Commission issued a Determination on Kronos' Petition to Revoke Subpoena, denying same, and requiring production of the documents referenced in Subpoena TPI - 864 on or before February 9, 2009. (EEOC's Determination on Kronos' Petition to Revoke Subpoena attached as Exhibit 14; see Exhibit 19.) On January 23, 2009, Lawrence Ashe, counsel for Kronos, sent an email to Alan Archer, the EEOC investigator assigned to the *Sandy v. Kroger* Charge, and requested that the attachments referenced in the Commission's Determination be forwarded to him.[7] (See Exhibit 19.) Mr. Archer responded via email on January 27, 2009, denying Kronos' request to produce the attachments. Mr. Ashe responded on

---

[6] Although the Commission rescinded Subpoena No. TPI - 832 in March 2008 pending further investigation, due to an administrative error, Kronos was not notified that the initial subpoena had been rescinded until October 2008.

[7] The attachments to the Commission's Determination are, in vast part, identical to the Exhibits listed in this Memorandum.

January 27, 2009 via email, stating that the EEOC was "required" to produce the attachments. (Emails between Mr. Ashe and Mr. Archer attached as Exhibit 15; see Exhibit 19.) On January 29, 2009, Mr. Archer responded by letter, explaining that, due to Kronos' status as a third-party, the Commission is precluded by the Privacy Act of 1974, as amended, 5 U.S.C. § 552a, ("Privacy Act") from turning over documents from an open investigation to a third party, such as those referenced in the Determination. (1/29/09 Letter from Archer to Ashe attached as Exhibit 16; see Exhibit 19).

On or about February 3, 2009, Mr. Ashe contacted one or more individuals at the EEOC's headquarters in Washington, D.C. via telephone, as well as Debra Lawrence, Acting Regional Attorney for the Philadelphia District, demanding production of the attachments. (See Exhibit 19.) Ms. Lawrence offered to request permission from Kroger to disclose the attachments to Kronos, in an attempt to promote cooperation in this matter while simultaneously protecting Kroger's rights under the Privacy Act.

On February 5, 2009, Trial Attorney Lisa Hernandez contacted Kroger's counsel, Keith Hult, via letter, and requested permission to disclose the attachments from the file to Kronos, in an effort to promote cooperation with the Commission's subpoena. (February 5, 2009 letter attached as Exhibit 17; see Exhibit 19.) Via letter dated February 9, 2009, Mr. Hult denied the Commission's request to share the documents from the file with Kronos. (2/9/09 letter attached as Exhibit 18; see Exhibit 19.)

To date, Kronos has not complied with Subpoena No. TPI - 864, nor has it made any good faith effort to show a willingness to cooperate with the Commission's investigation (See Exhibit 19.)

### III. ARGUMENT

1.      Respondent Has No Valid Defenses for Failing to Comply with the EEOC's
        Subpoena.

        a.      **Administrative subpoena enforcement**
                **proceedings are summary in nature.**

Even if Respondent's objections are considered, it has no valid defenses for failing to

fully comply with the EEOC's subpoena.  Administrative subpoena enforcement proceedings in

federal court are summary in nature and involve only limited judicial review.  *EEOC v.*

*Maryland Cup Corp.*, 785 F.2d 471, 475 (4th Cir.), *cert. denied*, 479 U.S. 815 (1986); *EEOC v.*

*Peat, Marwick, Mitchell & Co.*, 775 F.2d 928, 930 (8th Cir. 1985), *cert. denied*, 475 U.S. 1046

(1986).  To successfully petition a court to enforce an administrative subpoena, the Commission

need only show: 1) that the subpoena is within the agency's authority; 2) that the agency has

satisfied its own procedural (due process) requirements; and, 3) that the information sought is

relevant to its investigation.  *EEOC v. Shell Oil Company*, 466 U.S. 54, 72 n.61 (1984); *EEOC v.*

*American & Efird Mills*, 964 F.2d 300, 302 (4th Cir. 1992); *EEOC v. Maryland Cup Corp.*, 785

F.2d at 475; *EEOC v. Peat, Marwick, Mitchell & Co.*, 775 F.2d 928, 930 (8th Cir. 1985), *cert.*

*denied*, 475 U.S. 1046 (1986); *EEOC v. A.E. Staley Mfg. Co.*, 711 F.2d 780, 788 (7th Cir. 1983),

*cert. denied*, 466 U.S. 936 (1984); *EEOC v. Children's Hospital Medical Center*, 719 F.2d 1426,

1428 (9th Cir. 1983) (*en banc*); *EEOC v. University of New Mexico*, 504 F.2d 1296, 1302 (10th

Cir. 1974).  Once this showing has been made by the Commission, the court must enforce the

subpoena unless the party being investigated can prove that the subpoena is unduly burdensome.

*E.g.*, *EEOC v. Children's Hospital Medical Center*, 719 F.2d at 1428; *EEOC v. Bay Shipbuilding*

*Corp.*, 668 F.2d 304, 313 (7th Cir. 1981); *EEOC v. South Carolina Nat'l Bank*, 562 F.2d 329,

332 (4th Cir. 1977); *see Oklahoma Press Publishing v. Walling*, 327 U.S. 186, 217 (1946).  As

11

the following discussion illustrates, Respondent has no basis for challenging the validity of the subpoena, and therefore, the subpoena should be enforced.

### b.      The subpoena is valid and within the agency's authority.

First, Congress has authorized, and indeed mandated, that the EEOC investigate charges of discrimination alleging that Title VII has been violated. 42 U.S.C. § 2000e-5(b).[8] The EEOC is investigating Vicky Sandy's charge that Kroger engaged in discrimination on the basis of her disability, in violation of the ADA. Congress conferred broad powers upon the Commission in furtherance of its investigatory responsibilities, granting the EEOC the authorization to subpoena any information "that relates to any matter under investigation or in question." 29 U.S.C. § 161 (incorporated into Title VII, 42 U.S.C. § 2000e *et seq.*, by § 710, 42 U.S.C. § 2000e-9); *see* § 709(e) of Title VII, 42 U.S.C. § 2000e-8(a). The investigation seeks to determine if Kroger has engaged in disability and/or race discrimination by virtue of its use of Kronos' personality assessment(s). As such, it is valid and fully within the agency's authority.

### c.      All procedural prerequisites have been fulfilled.

The EEOC has complied fully with all procedural requirements underlying the subpoena. A valid charge has been filed and the subpoena contains all the information required by the

---

[8] Congress has vested in the EEOC the authority to investigate charges alleging violations of the ADA by incorporating by reference the enforcement scheme set forth in Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 12117. Thus, where Title VII provisions and references are cited herein in support of the EEOC's subpoena powers with respect to the information pertaining to race, they are also fully applicable to investigations of ADA violations.

EEOC's regulations.  29 C.F.R. § 1601.16 (elements of subpoena)[9]; *see also EEOC v. Shell Oil Company*, 466 U.S. 54, 68-69 (1984); 29 C.F.R. § 1601.12 (requirements of valid charge).

Kronos does not, and could not, allege that these basic requirements have not been met.

### d.      The information sought is relevant.

The concept of relevancy in Commission investigations under Title VII is far broader than that provided for in the Federal Rules of Civil Procedure.  In the context of its administrative investigations, the Commission is permitted "access to virtually any material that might cast light on the allegations against the employer."  *EEOC v. Shell Oil Co.*, 466 U.S. 54, 68-69 (1984).  *See also EEOC v. Lockheed Martin Corp.*, 116 F.3d 110, 113 (4th Cir. 1997); *EEOC v. Norfolk Police Dept*; 45 F.3d 80, 82 (4th Cir. 1995); *EEOC v. American & Efird Mills, Inc.*, 964 F.2d 300, 302-03 (4th Cir. 1992); *EEOC v. Maryland Cup Corp.*, 785 F.2d 471, 475-76 (4th Cir. 1986), *cert. denied.* 479 U.S. 815 (1986); *Sansend Fin. Consultants, Ltd. v. Federal Home Loan Bank Bd.*, 878 F.2d 875, 882 (5th Cir. 1989) (*quoting EEOC v. Elrod*, 674 F.2d 601, 613 (7th Cir. 1982) (administrative subpoena may seek any information that "touches a matter under investigation.")

Even assuming that the Commission were only investigating the allegations raised by the Charging Party, which pertain to disparate treatment because of her disability, much of the subpoenaed evidence is relevant to those allegations and therefore within the Commission's authority to obtain. The evidence may identify witnesses, aid in identifying others to whom the Charging Party's alleged treatment may be compared, shed light upon Kroger's relevant policies

---

[9]  29 C.F.R. § 1601.16(a) states, in relevant part:  The subpoena shall state the name and address of its issuer, identify the person or evidence subpoenaed, the person to whom and the place, date and the time at which it is returnable or the nature of the evidence to be examined or copied, and the date and time when access is requested.  A subpoena shall be returnable to a duly authorized investigator or other representative of the Commission.

and practices, and is otherwise relevant context evidence that will aid in understanding the allegations, and Kroger's responses to those allegations.

However, the present investigation is **not** limited solely to the Charging Party's allegations. Rather, the Commission is seeking to determine whether the personality assessment(s) in question have an unlawful disparate impact on disabled and black test-takers. To put the issue of relevancy into context, a brief explanation of the analysis used in disparate impact cases, and its relation to the facts of this investigation, follows.

In determining the existence of a prima facie case of disparate impact, it is necessary to identify the specific employment practice at issue. Second, through relevant statistical analysis, the Commission must determine whether the practice had an adverse impact on a protected group. 42 U.S.C. § 2000e-2 (k); *Isabel v. City of Memphis*, 404 F.3d 404 411-412 (6th Cir. 2005). The specific employment practice here has been identified: it is the use of the Kronos personality assessment by Kroger.

The Commission has some evidence that use of the personality assessment may have a disparate impact on black and disabled individuals, but it is as yet unknown to the Commission whether the impact is statistically significant, because Respondent has refused to provide the information that would make it possible for the Commission to perform the appropriate statistical analysis. Similarly, Respondent has not provided evidence of its own statistical analysis proving or disproving the existence of a statistically significant disparate impact.

Once a plaintiff has established a prima facie case of disparate impact, the defendant is required to demonstrate that the selection procedure that caused the impact is job-related and consistent with business necessity. 42 U.S.C. § 2000e-2 (k); *United States v. State of Delaware*, *et al.*, 2004 U.S. Dist. Lexis 4560, 93 Fair Emp. Prac. Cas. (BNA) 1248 (D. Del. 2004), citing

*Lanning v. SEPTA*, 181 F.3d 478, 489 (3d. Cir. 1999) ("*Lanning I*").  In order to meet this

standard, the Third Circuit has ruled that an employer must prove that its hiring criteria

effectively measure the "minimum qualifications for the successful performance of the position

in question." *El v. SEPTA*, 479 F.3d 232, 242 (3d. Cir.  2007).   See also *Lanning v. SEPTA*, 308

F.3d. 286, 292 (3d. Cir. 2002); *El v. SEPTA*, 479 F.3d 232, 240 (3d Cir. 2007) (in the context of

disparate impact analysis, the Third Circuit has rejected the notion of "more is better.")

 In *El*, the Third Circuit further noted that courts have refused to accept "common sense"

assertions of business necessity and instead have required empirical proof that the challenged test

criteria predicts job performance. 479 F.3d at 240.  The Uniform Guidelines on Employee

Selection Procedures apply in the disparate impact context ("UGESP").  29 C.F.R. § 1607 *et

seq.*; *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 995 n. 3, 108 S. Ct. 2777, 101 L. Ed. 2d

827 (1988) (describing how lower courts look to 29 C.F .R. § 1607 for guidance in adverse

impact cases).

 The EEOC's UGESP allows employers to determine through professional validation

studies whether their employment tests are job related.  *Albemarle Paper Co. v. Moody*, 422 U.S.

425, 430-31 (1975), 95 S. Ct. 2362; *see* 29 C.F.R. pt. 1607.  While these guidelines have not

been promulgated pursuant to formal procedures established by Congress, *see Albemarle Paper

Co.*, 422 U.S. at 431, 95 S. Ct. 2362, they are nevertheless "entitled to great deference" as "[t]he

administrative interpretation of the Act by the enforcing agency," *Griggs v. Duke Power*, 401

U.S. 424, 433-34 (1971), 91 S. Ct. 849; *Abermarle Paper Co.*, 422 U.S. at 431, 95 S. Ct. 2362.

The EEOC UGESP and the *Griggs* case present the same message:  tests with a discriminatory

impact are impermissible unless the employer demonstrates through the UGESP that the tests are

job related.  *See Albemarle Paper Co.*, 422 U.S. at 431, 95 S. Ct. 2362.  To date, neither Kroger

nor Respondent Kronos has produced to the Commission any information which would definitively establish whether the assessments used as its selection tools are job-related and/or consistent with business necessity.

If a court concludes that an employer has met its burden of proving that its selection criteria was job-related and consistent with business necessity, a plaintiff can still prevail by showing that "other tests or devices, without a similarly undesirable [discriminatory effect], would also serve the employer's legitimate interest in efficient and trustworthy workmanship." *Watson v. Fort Worth Bank & Trust*, 478 U.S. 977, 998 (1988). The Commission would then need to determine whether there are less discriminatory alternatives available to Kroger in hiring qualified cashiers and baggers than subjecting them to a full blown personality assessment, such as that produced and administered by Kronos.

In the context of a disparate impact investigation such as this one, it is well-settled that the Commission possesses broad authority under Title VII (and thus under the ADA) to expand the scope of its investigations to encompass possible discrimination of a type not alleged in a charge of discrimination but nevertheless uncovered during the course of the Commission's investigation of that charge. *See, e.g.*, *General Telephone Co. of Northwest, Inc. v. EEOC*, 446 U.S. 318, 313 (1980) ("[T]he Courts of Appeals have held that EEOC enforcement actions are not limited to the claims presented by the charging parties. Any violations that the EEOC ascertains in the course of a reasonable investigation of the charging party's complaints are actionable."); *EEOC v. General Electric Co.*, 532 F.2d 359, 364 (4th Cir. 1976). Rather, a charge is a "'starting point' for a Commission investigation, which may then 'include in its deliberations (and base its determinations on) all facts developed in the course of a reasonable investigation of that charge....'" *Id.* at 465. "**If the EEOC uncovers during [an] investigation**

16

facts which support a charge of another discrimination than that in the filed charge, it is neither obliged to cast a blind eye over such discrimination nor to sever those facts and the discrimination so shown from the investigation in process and file a Commissioner's charge thereon...[,]" *Id.*, a procedure which **"would be simply a useless exercise in technical nicety.**" *Id.* at 366 (emphasis added). The Commission may investigate "any discrimination stated in the charge itself or developed during the course of a reasonable investigation of that charge..." *Id. See also EEOC v. Chesapeake & Ohio Railway Co.*, 577 F.2d 229, 231-32 (4th Cir. 1978); *EEOC v. Hearst Corp.*, 553 F.2d 579, 580-81 (9th Cir. 1977). Furthermore, the Commission may issue cause findings on discrimination that does not appear in the original charge, so long as it arises out of the reasonable investigation of same.[10] *See EEOC v. Occidental Life Ins. Co. of Cal.*, 535 F.2d 533, 540-42 (9th Cir. 1976), aff'd, 432 U.S. 355 (1977) (citing *EEOC v. General Electric Co.*, 532 F.2d 359, 364 (4th Cir. 1976)). Private plaintiffs may also maintain claims of discrimination extending beyond those alleged on the face of their original charge, so long as the additional claims are within the scope of the relevant agency's authority to investigate. *See Caldwell v. Federal Express Corp.*, 908 F. Supp. 29, 34-36 (D. Maine 1985).

During the course of its investigation of Ms. Sandy's allegations of discrimination, the Commission has discovered evidence of potential race discrimination in hiring regarding other job applicants. This evidence includes failure to hire charges filed with the Commission and/or its corollary state Fair Employment Practice agencies against Kroger on the basis of Title VII, race (black), as well as widely accepted research into personality assessments and their impact on minority test-takers.

---

[10] The Commission's expertise in determining what constitutes a "reasonable investigation" merits deference. *Hubbard v. Rubbermaid, Inc.*, 436 F. Supp. 1184, 1189-91 (D. Md. 1977).

17

For instance, in a 2007 NBER Working Paper by David Auter, an Economics professor at MIT and David Scarborough, a Black Hills State University professor of Business and Technology and Kronos employee, the authors present findings that "there are marked differences in the distribution of standardized (i.e. mean zero, variance one) test scores among White, Black and Hispanic applicants." *Will Job Testing Harm Minority Workers?*, David H. Autor and David Scarborough, NBER Working Paper No. 10763 at pg. 8 and Table II, September 2004, Revised January 2007, JEL No. D63, D81, J15, J71, attached as Exhibit 20. The findings of this NBER paper underscore the importance of Title VII validation of personality assessments, and provide part of the Commission's basis for questioning the validity of the personality assessment(s) used by Kroger.  The NBER paper findings are highly relevant because the very personality assessment utilized in the study was Respondent's.[11]  *See Id*. at pg. 6.  The information sought by Subpoena TPI - 864 is necessary to the Commission's reasonable investigation of Ms. Sandy's charge, as well as the charges of similarly situated Kroger job applicants, to ensure that the Kronos' personality assessment is valid and lawful pursuant to the ADA and Title VII.

It is patent that the requested information "might cast light on the allegations" made by Charging Party Sandy.  Ms. Sandy alleges disability discrimination in Kroger's failure to hire her, which was based, at least in part, on her performance on the Kronos assessment.  In light of these allegations, the Subpoena specifies six categories of evidence, of which EEOC seeks the following:

---

[11] The NBER authors studied the personality assessment manufactured by Unicru, Respondent's corporate predecessor.  *See NBER Working Paper 10763* at pg. 6.

18

*          *          *

1.      Produce any and all documents and data constituting or related to validation studies or validation evidence pertaining to Unicru[12] and/or Kronos assessment tests purchased by The Kroger Company, including but not limited to such studies or evidence as they relate to the use of the tests as personnel selection or screening instruments.

2.      Produce the user's manual and instructions for the use of the Assessment Tests used by The Kroger Company.

3.      Produce any and all documents and data, including but not limited to correspondence, notes, and data files, relating to the Kroger Company; its use of the Assessment Tests; results, ratings, or scores of individual test-takers; and any validation efforts made thereto.

4.      Produce any and all documents discussing, analyzing or measuring potential adverse impact on individuals with disabilities and/or an individual's race.

5.      Produce any and all documents relating to any and all job analyses created or drafted by any person or entity relating to any and all positions at the Kroger Company.

6.      Furnish a catalogue which includes each and every assessment offered by Unicru/Kronos. Additionally provide descriptions of each assessment.

Subpoena No. TPI - 864 attached as Exhibit 9.

Paragraph No. 1 of the Subpoena requires production of information relating to the validity of the assessment tests utilized by Kroger, and cuts to the heart of this investigation. These documents are relevant because they enable the EEOC to understand Kronos' validation studies with respect to the assessment(s) use as a personnel selection device or screening instrument. They will assist the Commission in determining whether the assessment(s) are job-related and consistent with business necessity, and whether the assessment(s) have been validated under UGESP.

_____

[12] As stated in Footnote 11, Unicru was, as the Commission understands, the corporate predecessor to Kronos.

Paragraph No. 2 of the Subpoena requires production of the user's manual and instructions for use of the assessment test(s) used by Kroger.  This information is relevant because it will offer insight into the way the assessment tests are meant to be utilized by employers.  This information will also provide insight into whether the assessment(s) are job-related and consistent with business necessity, and whether they have been validated under UGESP.  It may also assist in confirming whether there is a less discriminatory alternative.

Paragraph No. 3 of the Subpoena requires production of documents relating to Kronos' correspondence and relationship with Kroger, as well as the results/scores of the individual assessments taken by Kroger job applicants.  This information will aid in understanding the process leading to Kroger's decisions with respect to hiring or not hiring certain job applicants, and is clearly relevant.  *See, e.g.*, *EEOC v. Ford Motor Credit Co.*, 26 F.3d 44, 46 (6th Cir. 1994) (comparative information regarding hiring is "absolutely essential").  This information will enable EEOC to determine through statistical analysis whether the Kronos/Unicru assessment(s) used by Kroger and administered by Kronos is having a statistically significant disparate impact on racial minority and/or disabled test-takers.

Paragraph No. 4 of the Subpoena requires production of all documents regarding the potential adverse impact of the assessment test(s) on individuals with disabilities and/or the potential for adverse impact as it relates to a test taker's race.  This information is relevant because it will shed light on any known potential adverse impact of the assessment test(s), and whether the disparate impact is statistically significant.

Paragraph No. 5 of the Subpoena requires the production of job analyses of positions at Kroger.  This information is relevant because it will aid the Commission in understanding the various available positions at Kroger and whether certain applicants were qualified or not.  It will

20

also provide evidence of whether the personality assessment(s) utilized are job-related and/or consistent with business necessity.  It will also shed light on the existence or absence of less discriminatory alternatives.

Paragraph No. 6 of the Subpoena requires production of a catalogue of the assessments offered by Kronos, along with descriptions of same.  This information is relevant because it will aid the Commission in determining which, if any, of Kronos' tests have an adverse impact on test takers with disabilities and those of different races.  Furthermore, the personality assessment test administered to Ms. Sandy has been identified by several different names by Kroger during the course of this investigation, and the official designations of the personality assessments would be helpful.

It is undeniable that the requested information may and likely will cast light on the allegations made by Ms. Sandy.  Thus, the information is relevant to the investigation and the subpoena should be enforced.

### IV.  CONCLUSION

For the foregoing reasons, this court should enforce the EEOC Subpoena No. TPI - 864. The subpoena seeks information relevant to a valid charge of discrimination that is within the EEOC's enforcement authority.  Further, Kronos has not established that complying with the subpoena would be unduly burdensome.  The Commission therefore urges the court to issue the accompanying proposed Order to Show Cause and to order Kronos to informally confer with EEOC to discuss the form of data production and logistics prior to actual production, consistent with the approach of Amended Federal Rules of Civil Procedure Nos. 26 and 34, and, after giving Kronos an opportunity to respond, enforce the subpoena.

Respectfully submitted,

DEBRA LAWRENCE
Acting Regional Attorney

JUDITH A. O'BOYLE
Supervisory Trial Attorney

/s Lisa H. Hernandez
LISA H. HERNANDEZ
Trial Attorney
PA ID No. 87634
US EEOC
William S. Moorhead Federal Building
1000 Liberty Avenue, Suite 1112
Pittsburgh, PA  15222
(412) 395-5852
lisa.hernandez@eeoc.gov